IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

TIM ALLEN PHILLIPS,

                Plaintiff,

          v.                               Civil No. 04-726-AS

JO ANNE B. BARNHART,              OPINION AND ORDER
Commissioner of Social Security

                Defendant.
_____

ASHMANSKAS, Magistrate Judge:

    Plaintiff Tim A. Phillips ("Phillips") filed this action under section 205(g) of the Social

Security Act (the "Act") as amended, 42 U.S.C. §405(g), to review the final decision of the

Commissioner of Social Security (the "Commissioner") who denied him social security disability

insurance benefits and supplemental security income ("Benefits").

PROCEDURE

    On or about May 22, 2001, Phillips filed an application for Benefits alleging an onset date

of June 1, 1999, which date was subsequently amended by his legal counsel to October 3, 2000.  The

application was denied initially, on reconsideration, and by the Administrative Law Judge (the "ALJ") after a hearing.[1] The Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner.

## FACTS

Phillips is forty-one years old. He completed the ninth grade. His past relevant work experience includes van driver, cab driver and courier. Phillips has not been involved in a successful work attempt since October 3, 2000. Phillips alleges disability because of upper and lower back pain.

### Testimony

Phillips testified that he left his last job as a cab driver because it had become too painful for him to turn the steering wheel. He was also having trouble remembering things, like addresses or where he put his keys down, because of the pain.

Phillips can't type or write for more than ten minutes and he "shakes like crazy" when he tries to write. Transcript at 571. He has a lot of upper- and lower-back pain and is unable to do dishes or clean the house. He is not able to walk any distance and can not stand or sit for very long without feeling pain in the range of nine or ten on a scale of one to ten. Lying down and taking Vicodin are the only things that relieve his pain.

Phillips spends his days lying around and watching television. He used to look for jobs on the computer when he was receiving unemployment benefits. He also used to play his Playstation regularly but it was in hock at the time of the hearing. He walks about two blocks everyday to the

_____

[1]A prior application for disability benefits was denied on March 14, 2000. This determination was not appealed.

store and back either once or twice a day.

## Medical Evidence[2]

In mid-September 1998, Phillips was examined by John Takacs, D.O., for complaints of low-back pain. An MRI of the lumbar spine revealed "mild to moderate broad central herniated nucleus pulposus at L4-L5 associated with effacement of both adjacent L5 nerve roots." Transcript at 230. Dr. Takacs diagnosed Phillips with an acute thoracolumbar and sacroiliac strain. He considered him unable to work for a week and advised Phillips to take Vicodin as needed.

On September 24, 1998, Dr. Takacs noted that Phillips appeared to be embellishing his pain as he was seen walking slowly and unassisted outside the office but then moved extraordinarily slow with the assistance of his wife while he was in the office. Phillips was released from work through October 19, 1998, and referred to another doctor for orthopedic consultation. On October 6, 1998, Phillips returned to Dr. Takacs office in a wheelchair complaining of increased pain and the inability to stand without his right leg collapsing. An electrodiagnostic examination was normal, revealing no evidence of muscle membrane irritability. Dr. Takacs again felt that there was a considerable amount of embellishment going on but he gave Phillips the benefit of the doubt.

On October 23, 1998, Dr. Takacs released Phillips to work with restrictions of "sitting only – no ambulation, no bending/twisting at waist through end of November." Transcipt at 220. Phillips never collected the work release. Three days later, Dr. Takacs signed a new work restriction indicating that Phillips should remain "off work 10/19/98 til 11/11/98." Transcript at 219. This total restriction was subsequently increased to 12/24/98.

---

[2] There is evidence of complaints of back pain predating this examination. However, in light of the October 2, 2000 onset date, the court finds that the earlier medical records are not relevant.

A lumbar myelogram and CT scan were performed on November 2, 1998. The myelogram revealed "the presence of a mild central extradural defect at L4-L5 suspicious of the presence of a central disc herniation." Transcript at 167. The CT scan showed normal bone mineralization and a small broad central herniated nucleus pulposus at L4-L5 which may irritate the L5 nerve roots.

Timothy J. Treible, M.D., first examined Phillips on December 24, 1998. He noted that Phillips exhibited a "significant amount of abnormal pain behavior" and that Phillips had degenerative disc disease at L4-5 which was destabilized by his recent injury. Transcript at 244. Dr. Treible restricted Phillips' work day to four hours without any bending, lifting, or twisting. A diskogram confirmed Dr. Treible's initial diagnosis and surgery was scheduled. On December 28, 1998, Phillips reported that he worked four hours on December 23, 1998, but that he was in extremely severe pain and was not able to return to work. He was released from all work through January 21, 1999, by Dr. Treible.

Dr. Treible performed an L4-L5 anterior interbody fusion on March 10, 1999. Phillips reported significant improvement and was released for light-duty work with no bending, twisting or lifting over 25 pounds on April 14, 1999. Phillips reported on June 22, 1999, that he was employed full time as a cabdriver with some discomfort at the end of his shift. Dr. Treible continued the restrictions of no bending, twisting or lifting over 25 pounds.

Phillips visited Willamette Falls Hospital on November 17, 1999, complaining of low back pain which started when he twisted his back after catching an elderly lady who slipped when she exited his cab. The examination was unremarkable and he was discharged with directions to ice his back over the next 48 hours and follow up with his treating physician.

On December 8, 2000, Phillips returned to Dr. Takacs complaining of severe mid- and upper-

back pain and some low-back pain after he was rearended while at a stop light.  Phillips was driving

a street sweeper and was hit by a compact automobile.  Based on Phillips' pain complaints upon even

gentle palpation, Dr. Takacs was concerned about a possible compression fracture and referred

Phillips for a thoracic x-ray series. He was  released from work through December 12, 2000.  The

x-rays revealed a normal thoracic spine and Dr. Takacs returned Phillips to work on December 13,

2000, with a restriction that he refrain from lifting for one week.  On December 15, 2000, Phillips

contacted Dr. Takacs and asked for an off-work note for two days because he was unable to drive

due to the pain.  Dr. Takacs did not give Phillips the note. Phillips then obtained a release from

Providence Milwaukie Hospital's emergency department limiting him to two hours driving each day

and light-duty work.  On December 18, 2000, Dr. Takacs limited Phillips' work hours to four hours

a day with no carrying of the blower backpack through January 8, 2001.  Phillips was also referred

for twice weekly physical therapy sessions for three weeks.

Phillips received his physical therapy from various providers at Kaiser.[3]  On December 21,

2000, after an initial evaluation of Phillips, Dr.  Jock T. Prinbow diagnosed a thoracic strain with

possible costovertebral dysfunction, and expressed a need to see Phillips' previous x-rays.  Dr.

Prinbow released Phillips to "modified work with no reaching with any load, either arm, no work

above shoulder area, and no vehicle operation for work (although we will consider something with

power steering)." Transcript at 296. This restriction  was subsequently modified to light-duty work

by another provider on December 28, 2000, after Phillips complained of pain when scraping paint

and powerwashing the sweeper and driveway.   At that time, Dr. Prinbow expressed confusion over

---

[3]The summary of the Kaiser physicians' treatment is taken from the record provided to
the court.  However, it appears that page 14 is missing.

the ongoing pain complaints from what should have been a minor injury based on the description of the accident and noted that Phillips "has pain behavior and multiple other contributing factors, no doubt." Transcript at 293.

On February 1, 2001, Dr. Prinbow explained to Phillips that there was nothing to support his thoracic strain claim or limits for work and released him to return to work with no limitations. Dr. Prinbow advised Phillips that if the pain increased, he should return to his previous limitations of sedentary office-type work. Thereafter, Phillips requested a change in physicians.

Phillips was examined by Dr. Ezra Rabie at Kaiser on February 8, 2001. Phillips complained of persistent thoracic pain and a fairly new onset of numbness into his right foot. He reported that he attempted to return to regular duty two days earlier as directed by Dr. Prinbow but experienced severe pain after only three minutes in his vehicle. He was not experiencing any back or leg pain at all, only mid-thoracic pain. Phillips requested that he be given a no- work note, stating that he was "incapable of sitting at a desk doing modified duty placing stickers on items." Transcript at 278. Dr. Rabie described Phillips as "an anxious gentleman who moves about the exam room very freely and easily. Changing position from sitting to standing * * * does not bother him at all." Transcript at 290. The doctor noted that Phillips had excellent range of mobility and that forward flexion, lateral bending, rotation and straight leg raising were carried out without hesitation or pain. However, Phillips had weakness and numbness in his right leg. Dr. Rabie ordered a bone scan, to rule out a fracture or degenerative bone disease, and an MRI and EMG of Phillips' lower back. Dr. Rabie also referred Phillips to Scott Young, an orthopedic surgeon.

Dr. Young found no objective support for Phillips' thoracic pain, diagnosing "thoracic spine strain pattern with symptoms magnification." Transcript at 279. He noted "we are dealing with

subjective complaints only here with no evidence of significant ongoing nephrology." Id. Dr. Young considered Phillips' right leg radiculopathy to be the result of the prior L4-5 fusion and referred Phillips for x-rays of the lumbar spine. On March 7, 2001, Dr. Rabie advised Phillips of his normal MRI and bone scan and that his EMG showed some abnormalities but nothing that would prevent his return to regular duty at work. Phillips then expressed a desire to seek treatment from Dr. Treible but was not allowed to by his medical coverage. Phillips then returned to Kaiser and again requested a different physician.

Phillips was examined at Kaiser by Michael L. Adams, M.D., on March 12, 2001, Dr. Adams also found little to support Phillips claim of continuing thoracic back pain. He was concerned about continued impingement at L5 on the right, which would explain the numbness and pain down Phillips' right leg, and recommended a myelogram and physical therapy. Dr. Adams released Phillips to work with modified duty restrictions which included "no lifting over five pounds, minimal bending, twisting or stooping, no vehicle operation and sedentary desk work only." Transcript at 280. On April 12, 2001, Phillips reported almost total resolution of the right radicular leg pain after the myelogram. Dr. Adams indicated that the CT myelogram was normal and that Phillips' symptoms seem to have resolved. "With regards to the thoracic back pain, I have nothing further to offer him. I find that he has no objective findings; therefore, he is, as of today, considered medically stationary with no permanent impairment with regards to his workers compensation claim. He is [to] return to full regular work without restrictions." Transcript at 276.

Phillips returned to Dr. Adams on April 24, 2001, complaining of a reinjury to his lower back when he lifted a backpack over his head. After examining Phillips and finding no objective support for Phillips' pain complaints, Dr. Adams:

"again explained to the patient that I really have no objective findings whatsoever to base ongoing care on. All of his imaging studies and his clinical exam are essentially normal except for subjective discomfort. He has lot[s] of pain amplification and pain behavior, seems to be quite nonanatomic. Once again, I find that he is medically stationary with no permanent impairment. I have urged him to follow up with his primary care provider, establish a relationship with him, and consider referral to [a] Chronic Pain Clinic outside of Workers Compensation. I have recommended [to] the insur[er] that his claim be closed. I have also recommended to the patient that I will have Dr. Victor Breen, our MCO Director, review his clinical care and his subjective complaints to see if he would recommend anything further. Thus far, the patient has been seen by Dr. Prinbow, Dr. Rabie, Dr. Scott Young of Orthopedics, myself, and a chiropractor. All of which have found no particular objective findings. He again is discharged from care and returned to full regular work without restrictions."

Transcript at 275-6.

That same day, Phillips was treated at Willamette Falls Immediate Care by Timothy J. Craven, M.D., to whom Phillips described the same pain complaints. X-rays of the lumbar spine revealed the prior fusion but no new trauma. Dr. Craven placed Phillips on light duty, restricting his lifting to 25 pounds with only occasional bending, twisting, and pushing/pulling. Dr. Craven concurred with Phillips and Phillips' employer's reported statement that he may never be able to return to his old job.

Phillips participated in a psychological evaluation performed by Steven P. Barry, Ph.D., on May 9, 2001. Phillips scored a 72 out of 100 on the Wechsler Adult Intelligence Scale-III, with a slight higher performance IQ than verbal IQ. Upon interpreting the results of Phillips' MMPI-2 test, Dr. Barry reported that:

From a psychological perspective, his prognosis is not particularly good. He seems to be the kind of individual who will only focus on physical problems and characteristics. It is very difficult, if not outright threatening, for him to look at psychological matters or to consider that there could be a psychological overlay to his physical problems and complaints.

Transcript at 311. He diagnosed Phillips with adjustment disorder with mixed anxiety and depressed

mood with a secondary diagnosis of pain disorder associated with both psychological factors and a general medical condition. He determined that Phillips had borderline intellectual functioning and some narcissistic personality characteristics. Dr. Barry emphasized that Phillips' "primary, if not sole, complaint has to do with back problems and associated severe pain." Id. He then remarked that "I would have to conclude that if he is to be awarded assistance, it would be for physical/medical problems and not because of any significant psychological impairment." Transcript at 312.

Phillips started treatment with yet another doctor in July 2001, seeking a refill of his pain medication when Dr. Treible refused to renew his Vicodin prescription. Deborah A. Satterfield, M.D., first examined Phillips on July 5, 2001. Phillips complained primarily of upper-back pain and an inability to raise his arms without trembling and extreme pain. However, Dr. Satterfield was able to move Phillips' arms in full motion without any pain. Dr. Satterfield prescribed pain and anti-inflammatory medications, referred Phillips for an MRI of his upper back and gave Phillips a no-work note through September 5, 2001. On July 16, 2001, Dr. Satterfield counseled Phillips on his need to limit his Vicodin and advised him that he would be off only until the evaluation was completed by the neurologist. If the neurologist returned him to work, Dr. Satterfield would concur in that decision.

After an independent examination completed by Harold G. Lee, M.D., on August 8, 2001, Phillips was found to be medically stationary as of May 1, 2001, with no significant limitation in the ability to repetitively use the hand, wrist, forearm, elbow and arm, except the shoulder area, and the foot, ankle, and knee, except the hip. Dr. Lee specifically found that:

> The worker's residual functional capacity indicates that patient has lifting and carrying capacity of up to 40 pounds with occasional lifting and carrying. Patient can sit, stand and walk two hours at each time.

There is no permanent preclusion of frequent activities of reaching and balancing, but stooping, climbing, crouching, pushing, pulling, kneeling, crawling and twisting should be handled on the frequent basis.

Patient does not have any permanent restriction in terms of working hours, but because of his poor endurance, he might need gradual increase to fulltime when he starts his work.

Transcript at 369.

Shortly thereafter, Phillips was examined by Kimberly L Goslin, M.D., Ph.D., upon a referral from of Dr. Satterfield. Phillips reported to Dr. Goslin that all of the doctors that had evaluated him to date were "incompetent" and that is why he was seeking a second opinion from her. Dr. Goslin reported that Phillips had a normal neurologic examination as well as an unremarkable MRI of the cervical spine. Dr. Goslin could not think of a physiologic basis for the tremor that Phillips was exhibiting when he attempted to raise his arms. On September 18, 2001, Phillips reported to Dr. Satterfield that he still had upper back pain but that he was doing better and was able to drive with his hands on the lower part of the steering wheel. However, Phillips returned to Dr. Goslin on September 28, 2001, complaining of increased pain which was exacerbated by movement. A second MRI of the cervical spine showed no evidence of disc herniation or spinal stenosis. Dr. Goslin recommended that Phillips "be referred to the Anesthesia Pain Clinic for further evaluations and recommendations regarding treatment of his now chronic pain." Transcript at 385. On October 4, 2001, Dr. Goslin reported that Phillips' EMG/Nerve conduction study was normal and recommended that Phillips return to work, noting that she thought it would be of benefit to him. She again recommended referral to a pain clinic based on the lack of evidence of nerve impairment or damage to explain his back pain.

Jonathan M. Blatt, M.D., examined Phillips on November 7, 2001, again at the request of

Dr. Satterfield. Phillips complained of pain in his lower back on the right and pain in his upper back which was exacerbated when he raises his arms. Phillips indicated that this pain was related to the December 2000 accident. Dr. Blatt considered Phillips' lower- back pain to be consistent with his lumbar EMG results of acute right L5 radiculopathy and recommended an epidural steroid injection. He was unable to find a clear etiology for the thoracic pain but felt that myofascial trigger point injections might be beneficial. Dr. Blatt noted that Phillips exhibited "abnormal pain behavior related to both of these conditions" and that Phillips "would probably benefit from some psychological counseling with regards to the abnormal pain behavior." Transcript at 262.

On November 26, 2001, Phillips sought a refill of his pain medication from Providence Milwaukie Hospital's emergency department. James E. Maras, M.D., the emergency physician, noted that Phillips was ambulatory, moved about the exam area freely without any obvious limitation of impairments and did not appear in any acute distress. Dr. Maras contacted Dr. Satterfield and Dr. Blatt, who advised Dr. Maras of Phillips' narcotic abuse and recommended that no narcotics be prescribed. Phillips was directed to use Tylenol or Aleve for pain and was authorized to return to work the next day.

On November 28, 2001, Phillips returned to Dr. Blatt for the recommended procedures. Immediately after, Phillips indicated that he was able to raise his arms over his head with no pain at all.

Phillips reported to Dr. Satterfield's office on December 18, 2001, that he was recently rearended by a lady applying mascara. He complained that his work driving for a medical transportation company was aggravating his pain and he requested more Vicodin.

On January 2, 2002, Robert McDonald, D.O., reviewed Phillips' medical file at the request

of the Commissioner and determined that Phillips should be limited to occasionally lifting 20 pounds and frequently lifting 10 pounds. Phillips was considered able to stand, walk and sit six hours in an eight-hour work day and was unlimited in his ability to operated hand and/or foot controls. Phillips should never climb ladders, ropes or scaffolding and should only occasionally stoop or crouch. Dr. McDonald considered Phillips' statement of his restrictions to be disproportionate to the expected severity or duration on the basis of the medically determinable impairments and found Phillips not disabled. This finding affirmed a prior determination by Scott Pritchard, D.O., that Phillips suffered from disorders of the back, both discogenic and degenerative, but that Phillips was not disabled.

Dr. Satterfield discussed Phillips' pain management with him again in early 2002, when Phillips complained that he thought he was going to get fired from his job. On February 25, 2002, he reported yet another rear-end accident when he was hit by a Pizza Hut driver. He complained of pain down his neck and into his arm, as well as increased back pain. He was referred to physical therapy and given small prescription of Vicodin. Phillips reported on March 19, 2002, that he was doing some water therapy but that he thought it was too much for him. Dr. Satterfield ordered another cervical MRI which showed no evidence of focal disc protrusion, central canal stenosis or significant neural foraminal stenosis. Dr. Satterfield considered a referral for chronic pain management and evaluation noting that "[i]t is going to be very difficult to get this patient over his recent motor vehicle accident as all of his other accidents have been difficult to get him back into the work force." Transcript at 525. On May 1, 2002, Dr. Satterfield stated that Phillips did not suffer any additional permanent disability as a result of the recent accidents. In July 2002, Phillips advised Dr. Satterfield that he was driving a cab again but that he had chronic pain. A month later, he reported that he couldn't use his arms at all and refused to lift them over his shoulders. He felt like

he could no longer work and was extremely upset and histrionic. He continued to have tremors in his upper body unless he was distracted, and then the tremor disappeared.

In a letter dated August 12, 2002, Dr. Satterfield opined that Phillips suffered from a permanent disability consisting of "subjective with permanent complaints regarding his upper shoulders and neck" and felt that Phillips would continue to need treatment in the form of analgesic medications, physical therapy and support. Transcript at 516.

## Vocational Evidence

Susan Burkett testified at the hearing as a vocational expert. The ALJ posed the following hypothetical:

> Please assume a 35-year-old individual that has a ninth-grade education with part of the tenth grade; who has the same past relevant work experience as this Claimant; who's occasionally able to lift 20 pounds, frequently 10 pounds; can sit, stand and walk six plus six hours out of an eight hour day – and I'll put down an option, sit, stand and walk; push and pull is authorized within the weight limits I give – I gave you; however, he's not to climb ladders, ropes or scaffolds and can only occasionally crouch.

Ms. Burkett testified that, based on this hypothetical, Phillips could not perform his past relevant work but could work as a parking lot attendant, ticket seller and ticket checker. Burkett then stated that these jobs would still be available if Phillips was unable to work one and a half days every month because of pain but not if he would miss two days every month.

## ALJ Decision

Initially, the ALJ noted that Phillips was successfully employed full-time as a delivery driver from February 2000 to October 2000. Thereafter, Phillips attempted work as a sweeper driver, van driver and cab driver in 2000, 2001 and 20002 respectively. He left each of these jobs after a couple of months due to his impairments.

The ALJ determined that Phillip's mental impairments were not severe and did not result in any significant work-related functional limitations. This determination was based on the report of Dr. Barry and Phillips' statement that his only restrictions are due to his physical impairments.

With regard to Phillips' physical limitations, the ALJ found that Phillips has chronic cervical and thoracic strain and degenerative disc disease of the lumbar spine, which are severe but do not meet any of the impairments listed in Appendix B of the Act. Phillips retains the ability to lift 20 pounds occasionally and 10 pounds frequently and walk and sit six hours out of an eight-hour workday with an option to change positions. Phillips' ability to stoop and crouch is limited and he is unable to climb ladders, ropes or scaffolds. Accordingly, Phillips retained the ability to perform a significant range of light work. Based on these findings and the testimony of the vocational expert, ALJ determined that Phillips retained the ability to perform the jobs of parking lot attendant, information clerk, ticket checker and ticket seller.

In reaching this decision, the ALJ found that Phillips' pain allegations were not entirely credible based on the documentary record. Specifically, the ALJ found that Phillips' testimony that his pain is at a nine or ten on a scale of one to ten is contradicted by the lack of objective medical to support this pain and statements by physicians that Phillips' pain behavior appeared exaggerated. The ALJ found that Phillips' testimony regarding his disabling hand tremors was inconsistent with a neurologist's statement that Phillips would benefit from work and the disappearance of the hand tremors when Phillips was distracted. Phillips' allegations that he must lie down during the day and that his memory was poor is not supported by medical evidence. Finally, Phillips' statement that he is disabled is belied by his reported daily activities and his representations to the state unemployment office that he is ready, willing and able to work at all times since his alleged onset

date.

## STANDARD OF REVIEW

The Act provides for payment of disability insurance benefits (DIB) to people who have contributed to the Social Security program and who suffer from a physical or mental disability. 42 U.S.C. § 423(a)(1). In addition, under the Act, Supplemental Security Income benefits (SSI) may be available to individuals who are age sixty-five or over, blind, or disabled, but who do not have insured status under the Act. 42 U.S.C. § 1382(a). The burden of proof to establish a disability rests upon the claimant. Gomez v. Chater, 74 F.3d 967, 970 (9th Cir.), cert. denied, 117 S. Ct. 209 (1996) (DIB); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir. 1992) (SSI). To meet this burden, the claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). An individual will be determined to be disabled only if there are physical or mental impairments of such severity that the individual is not only unable to do previous work but cannot, considering his or her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §§ 423(d)(2) (A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI because he or she is disabled. 20 C.F.R. §§ 404.1520 and 416.920; Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (DIB); Quang Van Han v. Bowen, 882 F.2d 1453, 1456 (9th Cir. 1989) (SSI). First, the Commissioner determines whether the claimant is engaged in "substantial gainful activity." If the claimant is engaged in such activity, disability benefits are denied. Otherwise, the Commissioner proceeds to step two and determines

whether the claimant has a medically severe impairment or combination of impairments. A severe impairment is one "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c) and 416.920(c). If the claimant does not have a severe impairment or combination of impairments, disability benefits are denied.

If the impairment is severe, the Commissioner proceeds to the third step to determine whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. 20 C.F.R. §§ 404.1520(d) and 416.920(d). If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is not one that is presumed to be disabling, the Commissioner proceeds to the fourth step to determine whether the impairment prevents the claimant from performing work which the claimant has performed in the past. If the claimant is able to perform work which he or she has performed in the past, a finding of "not disabled" is made and disability benefits are denied. 20 C.F.R. §§ 404.1520(e) and 416.920(e).

If the claimant is unable to do work performed in the past, the Commissioner proceeds to the fifth and final step to determine if the claimant can perform other work in the national economy in light of his or her age, education, and work experience. The burden shifts to the Commissioner to show what gainful work activities are within the claimant's capabilities. Distasio v. Shalala, 47 F.3d 348, 349 (9th Cir. 1995) (DIB); Drouin, 966 F.2d at 1257 (SSI). The claimant is entitled to disability benefits only if he or she is not able to perform other work. 20 C.F.R. §§ 404.1520(f) and 416.920(f).

When an individual seeks either DIB or SSI because of disability, judicial review of the Commissioner's decision is guided by the same standards. 42 U.S.C. §§ 405(g) and 1383(c)(3).

This court must review the case to see if the decision of the Commissioner is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. Drouin, 966 F.2d at 1257. It is more than a scintilla, but less than a preponderance, of the evidence. Id.; Gonzalez v. Sullivan, 914 F.2d 1197, 1200 (9th Cir. 1990). Even if the Commissioner's decision is supported by substantial evidence, it must be set aside if the proper legal standards were not applied in weighing the evidence and in making the decision. Gonzalez, 914 F.2d at 1200. The court must weigh both the evidence that supports and detracts from the Commissioner's decision. Id. The trier of fact, and not the reviewing court, must resolve conflicts in the evidence, and if the evidence can support either outcome, the court may not substitute its judgment for that of the Commissioner. Gomez, 74 F.3d at 970.

## DISCUSSION

Phillips asserts that the ALJ erred when he found that Phillips' mental deficits were not severe; rejected Satterfield's statement that Phillips was incapacitated; rejected Phillips' pain complaints as excessive and his testimony regarding his limitations; considered Phillips' application for employment benefits as evidence that Phillips was able to work; and posed an incomplete hypothetical. The court will address each of these assertions below.

The applicable regulations state that "[a]n impairment is not severe if it does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §404.1521(a). Basic work activities are defined as use of judgment, responding appropriately to supervision of co-workers and usual work settings; and dealing with changes in a routine work setting. Edlund v. Massanari, 253 F.3d 1152, 1159 (9th Cir. 2001).

The only evidence of Phillips' mental deficits is the psychological evaluation performed by Dr. Barry. Dr. Barry found that Phillips had borderline intellectual functioning, an anxiety disorder with mixed anxiety and depressed mood and a pain disorder associated with both psychological factors and a general medical condition. He opined that Phillips' prognosis was not particularly good and that Phillips would continue to focus on his physical problems. He did not indicate that Phillips had any problems with use of judgment, responding appropriately to co-workers and work settings or dealing with changes in a work setting. In fact, Dr. Barry represented that Phillips was cooperative in the testing process, was pleasantly funny and enjoyed some word play and silliness, showed a nice perseverance of effort, was not distracted by internal or external stimuli and was oriented in all spheres. He specifically stated that Phillips "primary, if not sole, complaint has to do with back problems and associated severe pain" and then concluded that if Phillips "is to be awarded assistance, it would be for physical/medical problems and not because of any significant psychological impairment."

The record is clear that while Phillips suffers from mild psychological deficits, these deficits do not qualify as severe under the Act. With the exception of Phillips' statements that his pain causes him to forget things, Phillips has never complained about psychological deficits and he has never been unable to maintain a job because of his mental impairments.

Phillips argues that the ALJ rejected Dr. Satterfield's opinion that Phillips was "incapacitated." Dr. Satterfield reported in a letter dated August 12, 2002, that "Mr. Phillips has a low tolerance for pain of any sort and the pain incapacitated him and caused him to not be able to work on an intermittent basis over the last eight months." She then stated that "I believe that his permanent disability consists of subjective with permanent complaints regarding his upper shoulders

and neck."

It is well settled that "greater weight is afforded to the opinion of a treating physician than to that of [a] non-treating physician, because the treating physician is employed to cure and has a greater opportunity to know and observe the patient as an individual." <u>Ramirez v. Shalala</u>, 8 F.3d 1449, 1453 (9th Cir. 1993)(internal quotations omitted). The ALJ must give "clear and convincing reasons" for rejecting the uncontroverted opinion of a treating physician and "specific, legitimate reasons" for rejecting a controverted opinion of a treating physician. <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989). See also <u>Lester v. Chater</u>, 81 F.3d 821, 830-32 (9th Cir. 1995).

The court is not convinced that the ALJ rejected Dr. Satterfield's opinion. She stated that Phillips had been incapacitated over the previous eight months, not permanently incapacitated. With regard to permanent restrictions, she noted that Phillips would continue to have subjective complaints about his upper shoulders and neck and would continue to need assistance. She did not indicate that the restrictions would prevent him from working or what activities would be limited by these restrictions. All of the objective studies performed by Dr. Satterfield, or at her request, were normal. The ALJ imposed rather dramatic restrictions on Phillips, limiting him to light or sedentary work with an option to change positions. Viewing the record as a whole, these limitations comply with the restrictions and concerns of Dr. Satterfield.

The assertion that the ALJ erred in rejecting Phillips' statements of excessive pain and his rejection of Phillips testimony regarding his limitations require similar analysis and will be addressed together. Generally, when assessing the credibility of the claimant, an ALJ must consider the following factors:

> (1) ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other

testimony by the claimant that appears less than candid; (2) unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities. . . The ALJ must also consider the claimant's work record and the observations of treating and examining physicians and other third parties.

Smolen v. Chater, 80 F.3d 1273, 1284 (9th Cir. 1996)(citations omitted).

In considering excessive pain complaints, the ALJ may not reject subjective complaints based solely on a lack of corroborative objective medical evidence regarding the alleged severity of the pain or degree of impairment once the claimant produces objective medical evidence of an underlying impairment. Bunnell v. Sullivan, 947 F.2d 341, 345 (9th Cir. 1991)(en banc). The ALJ can reject a claimant's testimony about his or her limitations only by offering clear and convincing reasons supported by specific facts in the record that demonstrate an objective basis for his disbelief. Regennitter v. Commissioner, 166 F.3d 1294, 1296-97 (9th Cir. 1999); Lester v. Chater, 81 F.3d at 834.

Phillips has presented evidence that he has a fusion at L4-L5 which may be the cause for some of his lower back pain and right leg numbness. However, there is no objective evidence to support Phillips' allegations of extreme upper back, neck and shoulder pain and resulting numbness and inability to move his arms. Virtually every doctor that examined or treated Phillips commented on the fact that Phillips reported pain far exceeding that warranted by his objective findings or by the incident that caused the pain. Phillips reported pain at a level of nine or ten after one of his stepchildren hit him in the ankle with a flying disc. The vast majority of Phillips' complaints derive from the December 2000 accident when he was driving a street sweeper and was rearended at a stoplight by a compact automobile. More than one treating physician was surprised that Plaintiff would suffer such extreme and extensive pain as a result of such an accident. Additionally, a

number of physicians noted an inconsistency in Phillips' pain behavior during an examination. For example, Phillips' upper body tremors disappeared when he was distracted.

In the absence of objective medical evidence supporting his claims and the physicians' consistent statements that Phillips seemed to be exaggerating his pain, the court is unable to find that the ALJ improperly rejected Phillips' allegations of pain and limitations. The ALJ noted that Phillips represented that he was ready, willing and able to work in his unemployment application to the State. Phillips object to the use of this evidence to support a finding that he is not credible. Even assuming that the ALJ erred in using this evidence, this is not sufficient grounds for overturning the ALJ's decision. The ALJ had adequate evidence in the absence of that representation to discredit Phillips' testimony.

Finally, Phillips argues that the hypothetical posed by the ALJ to Ms. Burkett was invalid in that it failed to include the exertional limitations indicated by Dr. Satterfield and the non-exertional limitations imposed by Dr. Barry. As discussed above, neither of these physicians imposed any specific limitations. Dr. Barry found that Phillips' disability should be based on his physical impairments and Dr. Satterfield stated generally that Phillips' disability derived from subjective complaints of upper and lower back pain but did not opine on Phillips' specific exertional limitations. The ALJ included the exertional limitations that are supported by the record and the hypothetical was accurate and not in error.

## CONCLUSION

The Commissioner's findings on Phillips' disabilities, considering the record as a whole, are

/////

/////

Page -21- OPINION AND ORDER                                        *{SIB}*

supported by substantial evidence.  The decision of the Commissioner is AFFIRMED.

DATED this 14th day of April, 2005.

_____/s/  Donald C. Ashmankas_____
DONALD C. ASHMANSKAS
United States Magistrate Judge